IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| SANDRA PHILPOT, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. |
| | : | 1:02-CV-2511-JOF |
| OFFICER LANCE M. WARREN | : | |
| and COBB COUNTY, | : | |
| | : | |
| Defendants. | : | |

## OPINION AND ORDER

This motion is before the court on Defendant Cobb County's motion for summary judgment [37-1], Defendant Warren's motion for summary judgment [39-1], and Defendants' motion for substitution of exhibits [63-1].

## I.    Background

### A.    Procedural History and Facts[1]

Plaintiff, Sandra Philpot, filed suit against Defendants, Cobb County and Officer Lance M. Warren, pursuant to 42 U.S.C. § 1983, alleging that during a traffic stop, Officer Warren

_____

[1]Plaintiff did not respond to Defendants' statement of material undisputed facts. Under Local Rule 56.1, the court could deem all of Defendants' statements admitted. Plaintiff instead submitted her own statement of material undisputed facts containing 158 numbered paragraphs. The court has reviewed the evidence presented by the parties and has drawn the facts therefrom in the light most favorable to Plaintiff.

conducted an illegal search and seizure and used excessive force, and that Cobb County was negligent in its hiring and supervision of Defendant Warren, in violation of Plaintiff's rights under the Fourth and Fourteenth Amendments.    Plaintiff also alleges a state law claim of battery pursuant to O.C.G.A. § 16-6-23 and § 51-1-14.

On March 20, 2001, Defendant Warren stopped an automobile driven by Harvey Philpot.    Plaintiff, Mr. Philpot's wife, was riding in the passenger seat.    Defendant Warren stopped the car because he did not believe Mr. Philpot or Plaintiff were wearing seat belts and the car was not maintaining its lane.    The weather at the time of the early morning stop was rainy, cold, and windy.    Mr. Philpot told Officer Warren that he was driving his wife to work, but when she began to have trouble breathing, he decided to go to the hospital because he believed she was having an asthma attack.    Mr. Philpot eventually admitted that his driver's license was suspended and that he was on probation for a drug violation.    Defendant Warren found a box cutter and extra blades in Mr. Philpot's wallet.    Mr. Philpot later testified that he used these tools in his job as a box cutter at a furniture store.    Defendant Warren arrested and searched Mr. Philpot, and placed him in the back seat of Defendant Warren's police car.    Mr. Philpot consented to Defendant Warren's search of the car.

Officers Epps and Danz arrived on the scene just before Mr. Philpot was placed in Defendant Warren's car.    Plaintiff told Officer Danz she was having an asthma attack and he called for an ambulance.    Emergency medical personnel determined that Plaintiff was not having an asthma attack and left the scene.

2

After Defendant Warren placed Mr. Philpot in his police cruiser, he returned to the Philpots' car where Plaintiff testified he repeatedly screamed at her, "Where you hiding the crack cocaine?  Where you hiding the drugs?"  Defendant Warren testified that he asked her these questions to make her believe that Mr. Philpot had already admitted she had drugs. Plaintiff was shocked and told Defendant Warren that she did not do drugs, and he responded that this was not the question he asked her.  He asked, "where you hiding the crack?"  Plaintiff was very upset and began crying.  Defendant Warren asked Plaintiff to step out of the car so that he could search it pursuant to Mr. Philpot's consent.

Defendant Warren told Plaintiff that he was going to search her for weapons and contraband.  He then removed her hat and searched it.  Officer Danz testified that Defendant Warren then told Plaintiff that he was going to search her for weapons, and he did do a brief search of her body.  He then directed her to stand in front of Officer Danz's car so he could search her.  The blue lights on Officer Danz's cruiser were flashing indicating that his camera would be in operation, however, the camera was not functioning and there is no video record of the search.  Plaintiff told Defendant Warren that he could not search her without a female officer present.  Defendant Warren told Plaintiff he did not need to get a female officer to search her.  Defendant Warren told Plaintiff, "I'm going to make you stand here in the rain until you let me search you."   Plaintiff continued to tell Defendant Warren that he needed to get a female officer, and he continued to respond that he did not.  Plaintiff was scared and cold

3

because she was only wearing a sun dress and eventually told Defendant Warren to "go ahead" and search her because she did not want to stand out in the rain getting wet.

Using the back of his hand, Defendant Warren first searched Plaintiff's breast area and then moved his hand to Plaintiff's crotch area.[2]   Officer Epps informed his supervisors that Defendant Warren searched up Plaintiff's legs to the upper most point of her crotch.   Officer Danz stated that Defendant Warren put his hand at Plaintiff's crotch and that the search took approximately 45 seconds.   Plaintiff testified that Defendant Warren was looking to see if she had any drugs in her underwear.   Plaintiff was clothed during the search, and Defendant Warren did not place his hands under her dress.   While Defendant Warren searched Plaintiff, Mr. Philpot was yelling from the back seat of the police cruiser that Defendant Warren could not touch his wife in that way.   Defendant Warren ultimately searched the car and did not find any drugs.

Upon returning to their duty stations, Officers Epps and Danz made a complaint to their Cobb County police supervisors concerning Defendant Warren's actions.   Plaintiff also immediately filed a complaint with the Cobb County Department of Public Safety Internal Affairs Unit.   An investigation determined that Defendant Warren violated the department's arrest procedure because he did not exercise proper discretion in searching Plaintiff.   The

---

[2]Plaintiff and her counsel repeatedly state that Defendant Warren touched her "vagina." Lest there be any confusion on the issue, the court emphasizes that Defendant Warren's search of Plaintiff did not go underneath her clothing.

4

investigation concluded that Defendant Warren made Plaintiff stand in horrible weather until she consented to the search and then conducted a very intrusive search of Plaintiff.   Internal Affairs also determined that Defendant Warren violated the County's search and seizure policy because if he had believed his search was proper under *Terry*, he would not have asked for Plaintiff's consent.   The investigating officer also concluded that Defendant Warren had violated department policy because he should have known that Plaintiff's consent to the search was not voluntary under the circumstances.   Based on his actions, the investigation also concluded that Defendant Warren had engaged in unbecoming conduct and did not act with courtesy.   The investigating officer recommended that Defendant Warren be terminated for his actions, and that recommendation was approved.

In his statement to Internal Affairs, Officer Epps stated that the search was at the best "gross inappropriate conduct" and at the worst "sexual battery."   In his deposition, Officer Epps testified that he did not believe anything about the circumstances warranted the kind of search that Defendant Warren undertook.   *See* Epps Depo., at 11-13.   Specifically, he noted that Plaintiff was an older woman clearly on her way to work at 5:30 a.m. on a cold and rainy morning.   *Id.* at 12.   Officer Epps testified that she offered no resistance, and if Defendant Warren wanted to search her for weapons, he could have called for a female officer.   *Id.* Officer Epps, who was an instructor at Cobb County's policy academy, testified that Defendant Warren did not search Plaintiff properly and that he was "shocked" at the manner in which he conducted the search because that is not how they are trained.   *Id.* at 14.   Officer

5

Epps testified that prior to this incident, training had been to search females with the back of the hand, up under the breasts, to the side of the breasts, and up into the crotch area and pocket area. After this incident, officers were instructed that if there was fear of a weapon on a female, she was to be handcuffed, placed in the back of the car and a search would wait for a female officer. *Id.* at 15.

Defendant Warren testified that he was trained to search a female in the same manner as a male, but just to use the back of the hand; make sure to put the female in front of the police car, so the search could be video-recorded, and have a witness present. *Id.* at 33-34. Defendant Warren "generally understood" this method and does not recall any specific training in it. *Id.* at 35.

Defendant Warren worked for the Cobb County Police Department from August 21, 1988 to June 7, 2001. During his time as a police officer, numerous citizens made complaints against Defendant Warren, including for excessive force, improper arrest, and discourteous behavior. *See* Warren Depo., at 19. One female citizen complained that Defendant Warren did not have probable cause to stop her, made an improper search of her, and improperly tried to coerce her into giving up a drug dealer. *Id.* at 45. Defendant Warren had found nude photos of this female with drug paraphernalia, and he tried to get her to give up her dealer. *Id.* at 46. Defendant Warren received a written reprimand for this incident. *Id*. at 47. On another occasion, he was also reprimanded for failing to file a use-of-force report and for using profanity when investigating suspicious activity and conducting an improper

6

search of a vehicle.  *Id*. at 52-53.  His supervisors informed him on at least two other occasions that he had made illegal stops and that he could not use a suspect's attitude to determine whether he would receive a verbal or written warning, or citation.  *Id.* at 70-74. Defendant Warren's supervisors were also concerned with his manner toward minority and low-income citizens.  *Id.* at 77-78.  Several months before the incident in question, Defendant Warren was transferred to a new unit.  *Id.* at 97.  At the time he came to his new position, his supervisors informed him they knew of his previous problems, he needed to tow the line, and he was being given a chance for a fresh start. *Id.* at 120.[3]

### B.    Contentions

Defendant Cobb County contends that Plaintiff was not arrested or seized and therefore the Fourth Amendment does not apply to her claim.  In the alternative, Defendant Cobb County argues, even if Plaintiff had been "seized" within the scope of the Fourth Amendment, Defendant Warren's search was not unreasonable because he had probable cause to arrest her for failure to wear a seatbelt.  Defendants also aver that Plaintiff gave her consent to Defendant Warren's search.  Alternatively, even if Plaintiff had not given her consent to the search, Defendant Warren was authorized to search Plaintiff under *Terry*.  Furthermore, Defendant Cobb County asserts that Plaintiff has not shown a sufficient custom or policy on

---

[3]Plaintiff asserts that Officer Epps also testified that a video of one of Defendant Warren's searches of a female was used to train officers on how ***not*** to conduct a search of a female.  The court has reviewed Officer Epps' deposition on this issue and finds it is unclear on this point.

the part of Cobb County to establish municipal liability.   Similarly, Defendant Warren asserts that even if his search violated the Fourth Amendment, he is entitled to qualified immunity.

Plaintiff argues that Defendant Warren did not have probable cause to pull over the Philpot car and therefore all searches that came thereafter were unreasonable.   Plaintiff also contends that she did not voluntarily consent to Defendant Warren's search.   She only assented because she did not want to stand in the cold, rainy weather.   Finally, Plaintiff avers that Cobb County is liable for failure to train and supervise Defendant Warren and that Defendant Warren's search was violative of clearly established law so as to preclude the application of qualified immunity.[4]

## II.    Discussion[5]

Supreme Court precedent mandates that in qualified immunity cases, the court must analyze first whether a constitutional violation has occurred before considering whether a

---

[4]On November 23, 2005, Plaintiff filed a "supplemental brief" in opposition to Defendants' motions for summary judgment.   Defendants filed a joint objection to this brief. Defendants are correct that this court's Local Rules do not provide for a sur-reply.   In any event, the court has reviewed Plaintiff's "supplemental brief" and as far as it can discern, the brief primarily contains verbatim excerpts of two cases concerning searches.   *Amaechi v. West*, 237 F.3d 356 (4th Cir. 2001), is clearly inapposite because it concerns a custodial search over a naked body that involved penetration of the plaintiff's genitalia.   Similarly, *Justice v. City of Peachtree City*, 961 F.2d 188, 191-94 (11th Cir. 1992), involved the strip search of a juvenile who was in the custody of police officers at a police station.   Thus, the court considers Plaintiff's supplemental brief only for the limited information it may offer.

[5]Plaintiff did not respond to Defendants' summary judgment arguments concerning her excessive force claim; therefore, the court deems that claim abandoned and grants Defendants' motions for summary judgment on excessive force.

8

defendant is entitled to qualified immunity.   *See*, *e.g.*, *Wilson v. Layne*, 526 U.S. 603, 609 (1999).

### A.        Search and Seizure

In *United States v. Purcell*, 236 F.3d 1274 (11th Cir. 2001), the court reviewed the district court's denial of a motion to suppress where the defendant contended that the length and scope of his detention during a traffic stop violated the Fourth Amendment.   There, a police officer stopped the defendant's car for following too closely.   The defendant pulled over and stepped out of his car.   Upon the officer's request, the defendant turned over his driver's license and rental agreement to the car.   While writing the citation, the officer asked the defendant whether he had ever been arrested and he responded that he had been arrested for drug related charges.   The officer asked the defendant if he had any "narcotics, weapons, firearms, contraband" or anything of the sort in the car and the defendant said that he did not. The defendant then gave the officer permission to search the car.   Prior to searching the car, the officer and his backup "patted down" the defendant and his brother to ensure they were not armed and told them to stand by the police car while their car was being searched.   The backup officer noted a white powder on the floorboard of the passenger compartment and then discovered crack cocaine under the dashboard.   The officers arrested the defendant and his brother.   The defendant contended that the cocaine should be suppressed because it was the product of an illegal search and his consent was involuntary.   *Id.* at 1276.

9

The court of appeals stated that a traffic stop was a seizure within the Fourth Amendment but because a routine traffic stop is limited in nature, it is more analogous to an investigative detention than a custodial arrest. *Id.* at 1277. The court then proceeded to analyze the stop under the confines of *Terry v. Ohio*, 392 U.S. 1 (1968). "Under *Terry*, an officer's actions during a traffic stop must be 'reasonably related in *scope* to the circumstances which justified the interference in the first place.'" *Id.* (emphasis added). The court noted that during a traffic stop, an officer can "take such steps that are reasonably necessary to protect their personal safety" including a protective search of the driver and passengers. *Id.* (citation omitted). The court also held that the officers did not exceed the scope of a permissible traffic stop when they asked the defendant whether he had any guns or contraband in the car because he had stopped the car in a high crime corridor of I-95, the defendant produced a rental agreement not signed by him, and the defendant admitted he had a drug related record.

Next, the court considered whether the defendant's consent to search the car was voluntary. "A consensual search is constitutional if it is voluntary; if it is the product of an 'essentially free and unconstrained choice.'" *Id.* at 1281 (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973)). The voluntariness inquiry is factual and depends on the totality of the circumstances. *Id.* The court should look at several indicators, including "the presence of coercive police procedures, the extent of the defendant's co-operation with the officer, the defendant's awareness of his right to refuse consent, the defendant's education and

10

intelligence, and the defendant's belief that no incriminating evidence will be found." *Id.*   In

*Purcell*, the court noted that there was no evidence that the officers had exerted force or were

verbally abusive, and thus, the court held that the consent was voluntary.   *Id.* (noting that the

encounter was "low key and professional").

      As an initial matter, the court notes that Defendant Warren's subjective beliefs about

the search are not relevant to the constitutional analysis.   *See Evans v. Stephens*, 407 F.3d

1272, 1280 n.9 (11th Cir. 2005) (finding officer's subjective belief that he needed

"reasonable suspicion" to conduct search not relevant to constitutional analysis); *see also

Whren v. United States*, 517 U.S. 806 (1996) (constitutional reasonableness of traffic stop

does not depend on subjective intention of officer).   Thus, the court need not consider the fact

that Defendant Warren testified he was not searching Plaintiff pursuant to *Terry* but rather

because he had received her consent.   Furthermore, the court notes that Plaintiff has never

argued that the length of the traffic stop was unconstitutional.

      "That a police officer may conduct a traffic stop where the officer has probable cause

to believe that a traffic violation has occurred is well-settled."   *Hudson v. Hall*, 231 F.3d

1289, 1295 (11th Cir. 2000).   Defendant Warren initiated the traffic stop because upon

passing the Philpots' vehicle, he noticed that they were not wearing seat belts.   Georgia law

requires all individuals in the front seat of a passenger car to wear seat belts.   *See* O.C.G.A.

§ 40-8-76.1.   He also observed the car drifting toward the center line unable to maintain its

lane.   While Plaintiff contends that it was too dark and rainy for Defendant Warren to observe

whether the Philpots were wearing their seatbelts, Plaintiff admitted that they were not wearing seatbelts.   *See* Plaintiff's Depo., at 36. Therefore, the court finds that Defendant Warren had probable cause to initiate the traffic stop.

The court must next consider the propriety of Defendant Warren's search.   Under *Terry*, an officer may search an occupant of a car for weapons if he has reasonably concluded that the person might be armed and dangerous.   392 U.S. at 21-22.   "An officer who has a reasonable suspicion that an individual is engaged in illegal activity and is armed with a concealed weapon is justified in conducting a limited search for weapons."   *See United States v. Hunter*, 291 F.3d 1302, 1306 (11th Cir. 2002).   "The issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger."   *Id.*   Here, Defendant Warren articulated that he suspected the couple because (1) they violated the seat belt law, (2) Mr. Philpot and Plaintiff contended Plaintiff was suffering from an asthma attack when medical personnel concluded that she was not, (3) Mr. Philpot did not pull the car to the customary right side of the road, (4) Mr. Philpot was on probation for a drug violation and had razor blades in his wallet, and (5) Plaintiff never directly answered his question about whether there were drugs in the car; rather, she replied that she did not believe in drugs and was not that kind of person.

Based on these circumstances, the court finds that Defendant Warren's initial search of Plaintiff – before the two discussed consent to search – was within that authorized by *Terry*.   During a traffic stop, an officer may take reasonable steps to assure his safety and that

12

of other officers on the scene.  *See Purcell*, 236 F.3d at 1277-78 (holding that it is well established that officers conducting traffic stop may take steps reasonably necessary to protect personal safety); *United States v. Blake*, 888 F.2d 795, 800-01 (11th Cir. 1989) (noting *Terry* permitted a "thorough search . . . of . . . arms and armpits, waistline and back, the groin and area about the testicles, and the entire surface of the legs down to the feet" but not a touching of the genitals).

The court next considers the interaction between Defendant Warren and Plaintiff after the brief "safety" pat down.  As the court has described above, Defendant Warren and Plaintiff engaged in a back-and-forth as to whether Defendant Warren needed to get a female officer to search Plaintiff.  Defendant Warren disagreed and told Plaintiff that they would both stand out in the rain until she gave him consent to search her.  Plaintiff eventually relented.  The court must decide under *Schneckloth* whether this assent was voluntary.  In *Purcell*, the court specifically noted that the defendants did not present any evidence that the officer "threatened force or violence" or that he was even "verbally abusive."  236 F.3d at 1281.  The officer did not make any suggestion to the defendant that he "had no right to refuse."  *Id.*  The court also determined that there was no indication that the defendant did not understand he could refuse the search.  *Id.*  Upon viewing the videotape of the traffic stop, the court viewed the interaction as "quite low key and professional."  *Id.*

Significantly, here, the court finds that Defendant Warren's behavior placed Plaintiff in the threat of continued detention and was thus inherently coercive.  He informed her that

13

the two of them would stand in the weather until she consented to a search.  He did not give

Plaintiff the choice of standing a safe distance away from the car while he searched it.  He did

not give her the choice of waiting out in the weather until a female officer arrived to conduct

the search.   Rather, he simply stated that the two of them would stand in the rain until she

consented to a search.[6]   No reasonable person in Plaintiff's circumstances would have felt

"free to leave" under these conditions.   While the court recognizes that consent might still be

voluntary if an individual does not feel "free to leave," *see Florida v. Bostick*, 501 U.S. 429,

435-36 (1991), it clearly is a factor that would weigh in the balance against finding voluntary

consent.   *See also United States v. Butler*, 102 F.3d 1191, 1197 (11th Cir. 1997) (in

determining whether consent is voluntary court should consider whether "the police conduct

would have communicated to a reasonable person that the person was not free to decline the

officer's request").

Furthermore, the weather that morning was extremely unpleasant – cold, rainy and

windy.   Plaintiff was dressed only in a sun dress and according to her testimony, she only

consented to the search because she did not want to stand out in the weather, and Defendant

Warren clearly stated that he was not going to place her into the police cruiser unless he

---

[6]The court notes that Defendant Warren disputes this and testifies that he gave Plaintiff
the option of waiting in the weather while he searched the car.  *See* Warren Aff., ¶ 15.
Similarly, Officer Danz testified that "I believe she gave consent to him and I believe that
Officer Warren gave her the option to either stand out in the rain while he searched the Ford
Taurus or she could sit in the back of my patrol vehicle."  *See* Danz Depo., at 94.

searched her first.   Moreover, unlike the situation in *Purcell*, a reasonable person could conclude based on Plaintiff's testimony that Defendant Warren was being verbally abusive and intimidating.   It does, however, seem that Plaintiff knew she could refuse to give consent to the search because she repeatedly told Defendant Warren that he could not search her but rather a female would have to search her.   Plaintiff also did not believe that any incriminating evidence would be found.

Based on the totality of the circumstances here, however, the court concludes that Plaintiff's consent under these circumstances was not voluntary.   Because Defendant Warren, himself, admitted that he did not have probable cause to search Plaintiff beyond a safety pat down, any additional search of her without consent violates the Fourth Amendment.[7]

**B.     Qualified Immunity**

Once a defendant raises qualified immunity, the defendant bears the initial burden of proving he was acting within the scope of his discretionary authority for federal qualified

---

[7]Defendants also assert, however, that Defendant Warren could have undertaken a search concurrent with a custodial arrest because an officer is permitted to make a custodial arrest for traffic offenses.   *See*, *e.g.*, *Atwater v. City of Lago Vista*, 532 U.S. 318 (2001) (upholding arrest for misdemeanor seatbelt violation).   It is not clear, however, that an officer is entitled to undertake a full search incident to an arrest where he does not arrest an individual even if he had the authority to arrest.   *Compare Lee v. Ferraro*, 284 F.3d 1188 (11th Cir. (2002) ("When an officer lawfully arrests an individual for the commission of a crime, no matter how minor the offense, the officer is entitled under controlling Supreme Court precedent to effectuate a full custodial arrest.").

15

immunity during the events in question.[8]   The burden then shifts to the plaintiff to show that the actions of the public official at the time they occurred violated clearly established law. *See*, *e.g.*, *Vinyard v. Wilson*, 311 F.3d 1340 (11th Cir. 2002).   The "salient question . . . is whether the state of the law . . . gave [the officer] fair warning that [his] alleged treatment of [the plaintiff] was unconstitutional."   *Id.* at 1350.   A federal statute or constitutional provision may be specific enough clearly to establish the law even in the absence of case law.   *Id.* at 1350-52 (discussing manner in which case law can clearly establish the law).   Similarly, in *Lee v. Ferraro*, the court noted that qualified immunity is not available when "the official's conduct lies so obviously at the core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of case law."   284 F.3d 1188, 1199 (11th Cir. 2002).

As an initial matter, the court notes the fact that Cobb County ultimately terminated Defendant Warren for his actions in this case would not necessarily preclude a determination that Defendant Warren is entitled to qualified immunity.   Defendant Warren's supervisors terminated him based upon an analysis of the policies of the Cobb County Police Department. Plaintiff has not argued that these policies are coextensive with the constitutional parameters of the Fourth Amendment in the search and seizure context, or that those parameters were clearly established as a matter of law at the time of the incident.   The fact that the Cobb

---

[8]No party disputes that Defendant Warren was acting within the scope of his discretionary authority.

16

County Police Department may hold its officers to a different standard than that constitutionally mandated in the Eleventh Circuit is not before this court. The role of the Cobb County Police Department was to determine whether Defendant Warren violated department policy and whether his actions warranted punishment. The role of this court is to determine whether Defendant Warren is entitled to qualified immunity as a matter of law. *See also Durruthy v. Pastor*, 351 F.3d 1080, 1092 (11th Cir. 2003) (concluding that officer's violation of department's internal policy does not vitiate finding of probable cause based on objective facts); *Craig v. Singletary*, 127 F.3d 1030, 1044 (11th Cir. 1997) (probable cause involves only constitutional requirements and not any local policies).

The court must determine, then, whether it was clearly established at the time of this incident that a reasonable officer would understand that Plaintiff's consent was not voluntary. The court notes that it has located no factually similar case to this one, and the parties have also not brought any to the court's attention. Obviously, this impacts the court's qualified immunity analysis. Furthermore, the Eleventh Circuit previously has held that the difficulty in clearly establishing law is "especially true when the inquiry is as heavily fact-dependent as the 'voluntariness' inquiry.'" *See Hudson*, 231 F.3d at 1297-98 (finding qualified immunity where officer stated, "if you don't want to be searched, then start walking" and citing *Schneckloth*'s discussion that none of the cases previously analyzing the voluntariness of consent "turned on the presence or absence of a single controlling criterion; each reflected a careful scrutiny of all the surrounding circumstances"). While it is true that Plaintiff was

17

extremely reluctant to consent to the search and apparently did so only to avoid the consequence of having to remain standing outside in the cold, wet weather, the court must conclude that at the time of the incident, there was no clearly established law to put Defendant Warren on notice that his actions were unconstitutional, and he is, therefore, entitled to qualified immunity on Plaintiff's Fourth Amendment claim.[9]

**C.    Municipal Liability**

In *Monell v. Department of Social Services*, 436 U.S. 658 (1978), the Supreme Court held that municipalities (and other local government entities) are "persons" within the meaning of 42 U.S.C. § 1983. The Court, however, consistently has declined to hold municipalities liable under a theory of respondeat superior. *See*, *e.g.*, *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986).   Rather, a plaintiff must demonstrate a municipal "policy" or "custom" that caused the plaintiff's injury in order to establish a municipality's liability.   *See*, *e.g.*, *Canton v. Harris*, 489 U.S. 378, 389 (1989).   The plaintiff must also show that "through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." *Board of Comm'rs v. Brown*, 520 U.S. 397, 404 (1997) (emphasis in original).  To impose liability on Cobb County for failing to act to preserve a constitutional right under section

---

[9]The court notes that Plaintiff has not raised an argument that even assuming that her consent was voluntary, Defendant Warren's search exceeded the scope of her consent.  The court notes, however, that Defendant Warren had prefaced his consent request with numerous questions to Plaintiff as to whether she was hiding any drugs; thus, his request for consent necessarily encompassed a search for drugs which would be more instructive than a "safety" pat down.

18

1983, Plaintiff must show (1) that her constitutional rights were violated; (2) that Cobb County had a policy or custom that constituted a deliberate indifference to her constitutional right; and (3) that the violation was caused by the policy or custom. *See Canton*, 489 U.S. at 388.

In *Wayne v. Jarvis*, 197 F.3d 1098 (11th Cir. 1999), the court further explicated the standard for establishing municipal liability. "[A] plaintiff seeking to impose liability on a municipality under § 1983 [must] identify a municipal 'policy' or 'custom' that caused the plaintiff's injury." *Id.* at 1105 (quotations and citations omitted). "A custom is a practice that is so settled and permanent that it takes on the force of law." *Id.* "To establish a policy or custom, it is generally necessary to show a persistent and wide-spread practice. Moreover, actual or constructive knowledge of such customs must be attributed to the governing body of the municipality." *Id.* "A plaintiff must show that the municipal action was taken with the requisite degree of culpability, i.e., that the municipal action was taken with 'deliberate indifference' to its known or obvious consequences." *Davis v. DeKalb County Sch. Dist.*, 233 F.3d 1367, 1375-76 (11th Cir. 2000).

Here, Plaintiff apparently contends that the previous occasions upon which Defendant Warren's interactions with the public were criticized by his supervisors constitute a custom or policy on the part of Cobb County to ignore Defendant Warren's shortcomings. (The court notes that Plaintiff does not argue any widespread policy on the part of Cobb County to permit its officers to conduct searches in violation of the Fourth Amendment.) Even if the court

19

presumes that the actions of Defendant Warren's supervisors constituted a custom or policy – which is far from clear – Plaintiff has not demonstrated that the governing body of Cobb County had actual or constructive knowledge of this custom or policy or that an official-decision maker in the Cobb County Police Department had actual or constructive knowledge. Plaintiff has not presented any evidence to contest that Defendant Warren received all of the training mandated by Georgia's Peace Officer Standards and Training Act, pursuant to O.C.G.A. § 35-8-1.  *See* Declaration of Ronald Storey, ¶¶ 10-12.  Furthermore, the evidence adduced by Plaintiff shows that Defendant Warren's supervisors carefully monitored his behavior and reviewed problematic incidents with him.   These actions do not constitute deliberate indifference to Defendant Warren's conduct.   Moreover, the fact that Officers Danz and Epps immediately informed their superiors about what they considered to be the inappropriateness of the incident certainly supports a conclusion that the Cobb County Police Department did not have a custom or policy of condoning illegal searches and seizures under these circumstances.  *See also Holmes v. Kucynda*, 321 F.3d 1069, 1078 (11th Cir. 2003) (plaintiff did not proffer sufficient facts to establish municipal liability where plaintiff offered only the actions of several officers to support allegation that they were insufficiently trained).

For the foregoing reasons, the court finds that Plaintiff has not proffered facts sufficient to show that Defendant Cobb County should be liable for the actions of Defendant

20

Warren.   Accordingly, the court GRANTS Defendant Cobb County's motion for summary judgment [37-1].

     **D.**     **State Law Claims**

Plaintiff asserts a state law battery claim against Defendant Warren pursuant to O.C.G.A. § 16-6-23 and § 51-1-14.  The Georgia Tort Claims Act does not apply here because it specifically excludes county employees from its coverage.  *See* O.C.G.A. § 50-21-22(5); *Ridley v. Johns*, 274 Ga. 241 (2001).   Under the 1991 amendments to the Georgia Constitution, public officials "are immune from damages that result from their performance of discretionary functions, unless those functions were undertaken with malice or intent to cause injury." *Anderson v. Barrow County*, 256 Ga. App. 160 (2002).  Plaintiff does not dispute that Defendant Warren was acting within his "discretionary authority" when conducting the traffic stop.  Here, even viewing the evidence in the light most favorable to Plaintiff, Plaintiff has not alleged any facts to show that Defendant Warren acted with "malice" or "intent to cause injury" during the traffic stop.   The court has no doubt that Defendant Warren's conduct made Plaintiff extremely uncomfortable, but Plaintiff, herself, testified that Defendant Warren did not seem to be getting any satisfaction out of his acts.   While misguided, Plaintiff has not presented any evidence to show that Defendant Warren acted with

21

malice or intended to injure her.   Therefore, the court GRANTS Defendant Warren's motion for summary judgment on Plaintiff's state law battery claim.[10]

### E.      Motion to Substitute Exhibits

Defendants ask the court to direct Plaintiff to substitute clean, unmarked copies of deposition exhibits because Plaintiff's counsel attached exhibits to the depositions that contained his personal notations.   Defendants contend that during discussions among counsel Plaintiff agreed to substitute clean copies of the exhibits before filing the depositions with the court.   Plaintiff has not responded to Defendants' motion indicating there is no opposition. Accordingly, the court GRANTS Defendants' motion for substitution of exhibits [63-1].

## III.    Conclusion

The court GRANTS Defendant Cobb County's motion for summary judgment [37-1], GRANTS     Defendant Warren's motion for summary judgment [39-1], and GRANTS Defendants' motion for substitution of exhibits [63-1].

---

[10]Because the court grants Defendant Warren's motion for summary judgment on the merits of Plaintiff's state law battery claim, the court need not address Defendant Warren's argument that in her response to Defendants' motions for summary judgment, Plaintiff impermissibly amended her complaint to allege the civil version of battery rather than the clearly inapplicable criminal version alleged in her complaint.

22

The Clerk of the Court is DIRECTED to DISMISS WITH PREJUDICE Plaintiff's complaint.

**IT IS SO ORDERED** this 21st day of February 2006.


_____s/ J. Owen Forrester_____
J. OWEN FORRESTER
SENIOR UNITED STATES DISTRICT JUDGE

23